## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| 1.  HETRONIC   INTERNATIONAL, INC., | ) ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. CIV-14-650-C |
| 1. HETRONIC GERMANY GMBH and | ) | |
| 2. HYDRONIC-STEUERSYSTEME-GMBH, | ) ) | |
| Defendants. | ) | **Jury Trial Demanded** |

### COMPLAINT

Plaintiff, Hetronic International, Inc. ("Hetronic International" and is referred to collectively with other Hetronic entities including, Hetronic-Malta Ltd., Hetronic USA Inc., Hetronic Asia Manufacturing & Trading Corporation as "Hetronic"), by and through its attorneys, MCAFEE & TAFT and JENNER & BLOCK LLP, hereby alleges as its Complaint against defendants Hetronic Germany GmbH ("H-Germany") and Hydronic-Steuersysteme-GmbH ("Hydronic") (collectively the "Fuchs Companies"), and states as follows:

### INTRODUCTION

1.      Despite the fact that the Fuchs Companies were distributors for Hetronic's radio remote control products, they secretly have been competing with Hetronic in violation of their contractual obligations. <u>First</u>, under the parties' agreements, the Fuchs Companies only were permitted to assemble and distribute Hetronic-branded products that contained genuine Hetronic parts or Hetronic approved parts.  Hetronic insisted on this requirement because, among other reasons, these products are used to operate heavy machinery, and defective parts could pose a significant public safety risk.  Also, because

these systems are sold under the Hetronic name, Hetronic wanted to ensure that its reputation and goodwill were not injured by the use of substandard parts by third party assemblers and distributors.  Despite the fact that customers believed that they were buying products with genuine Hetronic-made or approved parts, the Fuchs Companies substituted counterfeit parts made by unknown and non-approved suppliers in violation of their contractual agreements.  As a result, the Fuchs Companies' breach has jeopardized Hetronic's reputation and goodwill and may create potential public safety concerns.  Second, solely due to their status as a Hetronic assembler and distributor, the Fuchs Companies gained access to Hetronic's confidential information including product designs and improvements.  The Fuchs Companies improperly used this Hetronic confidential information to make these counterfeit parts and set up their competing business in further breach of the parties' agreements.  Third, under the parties' agreements, the Fuchs Companies agreed to act in Hetronic's best interest and not sell any products that compete with Hetronic.  The Fuchs Companies' failure to comply with these provisions has further injured Hetronic.

## THE PARTIES

2.      Hetronic International is a Delaware corporation with its principal place of business in Oklahoma City, Oklahoma.  Hetronic conducts business in the transportation, energy, electronics, and manufacturing industries though its subsidiaries and partners.

3.      H-Germany is a German company with its principal place of business in Langquaid, Germany.  Until the recent termination of the parties' agreements, H-Germany was Hetronic's distributor for Germany.  A true and correct copy of the

Hetronic Distribution and Assembling Partner Agreement with H-Germany (the "H-Germany Distribution Agreement") is attached hereto as Exhibit 1.

4.      Hydronic is an Austrian company with its principal place of business in Altheim, Austria.  Hydronic also uses the name Hetronic Central Eastern Europe.  Until the recent termination of the parties' agreements, Hydronic was Hetronic's distributor for the following territories:  Austria, Slovenia, Croatia, Serbia, Montenegro, the Republic of Macedonia, Bosnia-Herzegovina, Romania, Bulgaria, Russia, Belarus, Ukraine, Kazakhstan, Armenia, Azerbajan, Georgia, Moldovia, Kyrgystan, Tajikstan, Tubkmenistan, Uzbekistan, Hungaria, Czech Republic, and Slovakia.  A true and correct copy of the Hetronic Distribution and Assembling Partner Agreement with Hydronic (the "Hydronic Distribution Agreement") is attached hereto as Exhibit 2.  Collectively the H-Germany Distribution Agreement and the Hydronic Distribution Agreement will be referred to herein as the "Distribution Agreements."

5.      Albert Fuchs ("Fuchs") is the majority owner and representative of both H-Germany and Hydronic.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2) and the amount in controversy is in excess of $75,000.

7.      The parties have agreed to litigate any disputes concerning the Distribution Agreements in this forum.

8.      Specifically, the Distribution Agreements contain choice of law provisions and exclusive forum selection clauses, which provide that the "construction, effect and

validity" of the respective agreements "and any claim in connection with, shall be governed by the law of Oklahoma.  Any dispute in relation" to the respective agreements "shall be settled amicably between the parties.  In case of failure to reach an amicable settlement, the courts of Oklahoma City, Oklahoma, USA shall have exclusive jurisdiction."  (Ex. 1 §9.3; Ex. 2 §9.3.)

9.     Venue is proper in this district pursuant to the forum selection clause in the Distribution Agreements and under 28 U.S.C. §1391(b).  (Ex. 1 §9.3; Ex. 2 §9.3.)

## FACTUAL BACKGROUND

10.     Hetronic designs and manufactures radio remote controls or wireless controllers for use in heavy industrial equipment.  Through its network of distributors, Hetronic sells and services radio remote controls in over 45 countries.

11.     Hetronic's radio remote controls are used to control many different types of equipment including, tower cranes, bridge cranes, rock crushers, man lifts, boat and other equipments lifts, and locomotives.

12.     Because these radio remote controls often are used in dangerous construction zones, they must comply with rigorous safety and reliability standards. Specifically, the radio remote controls used in these applications must be well designed, manufactured, and tested to avoid significant property damage and operator injury, including death.

13.     These remotes also are used in hazardous environments to control equipment and personnel movement, including mines and oil fields.  Obviously the result

of defective products in these areas can be harmful to many people at one time if there were an explosion caused by a defective or non-compliant product.

14.     Hetronic's radio remote controls are designed and manufactured with high quality electronic and mechanical components.   The use of inferior or unapproved components or a poor design could lead to machines operating independently of the operator, meaning the equipment could make movements that the operator did not intend with potentially disastrous results.

**The Fuchs Companies Were Required to Use Hetronic-Made or Approved Parts**

15.     Under the Distribution Agreements, Hetronic granted the Fuchs Companies the right to assemble and distribute its radio remote controls in the specified geographic territories.  (Ex. 1 §§1-2; Ex. 2 §§1-2.)

16.     In particular, Section 1 of the Distribution Agreements provided:

HETRONIC grants:

the rights for the distribution of HETRONIC's radio remote controls systems to be used to control construction machinery and industrial machinery

and

the rights for the assembly of HETRONIC radio remote controls with components solely provided or approved by HETRONIC.

-   Hereinafter referred to as the Products  -

to the Partner [the Fuchs Companies] for the Contractual Territory described under §2, along with pertaining advisory services and after-sales-services.  The distributor is engaged with maintaining and building up a dealer network in the Contractual Territory, also along with customer-advisory-services.

(Ex. 1 §1; *accord* Ex. 2 §1.)

17.    Under Section 6.1 of the Distribution Agreements, the Fuchs Companies also received the "right to assemble" Hetronic radio remote controls according to Hetronic "standards, documentations, and plans."  (Ex. 1 §6.1; Ex. 2 §6.1.)

18.    As part of the right to distribute and assemble, Hetronic also granted the Fuchs Companies the right to use Hetronic's trade name and trademark.  Specifically, Section 6.8 of the Distribution Agreements provided that the Fuchs Companies "can use the name and logo of HETRONIC in [its] Literature, or any other kind of Publication/Advertisement, or on the assembled Products, or in [its] company name, only if the Partner signed the separate 'HETRONIC-Name-License Agreement.'"  (Ex. 1 §6.8; *accord* Ex. 2 §6.8.)   Both H-Germany and Hydronic signed the separate License Agreement referred to in Section 6.8.  Under the License Agreement, both H-Germany and Hydronic were permitted to use the Hetronic name at no charge.

19.    Section 6.2 of the Distribution Agreements reemphasized the requirement that the Fuchs Companies only use genuine Hetronic parts or Hetronic approved parts, providing that:  "In his assembling activities, the PARTNER [the Fuchs Companies] can only use parts which: -are bought from HETRONIC, or –parts which were approved in writing by HETRONIC's group QA department at HETRONIC International in accordance to internal HETRONIC procedures."  (Ex. 1 §6.2; Ex. 2 §6.2.)

20.    These requirements exist to ensure that Hetronic's radio remote controls are assembled with high quality electronic and mechanical components.  Small defects in components can have disastrous consequences.  A simple mechanical or electrical defect on a switch could lead to unwanted movement of machinery.  For example, a defective

switch or output board could cause a large tower crane to malfunction or become unstable, resulting in it crashing to the ground and causing substantial physical injury, including death, and economic harm.

21.    Many Hetronic parts are made in Hetronic facilities in Malta and the Philippines.  Because the Malta facility also manufactures automotive parts, the entire facility meets the high production standards necessary to comply with the quality and safety requirements of OEM car manufacturers.  These standards are significantly more stringent than most manufacturing standards.  Likewise, while the Philippines' plant does not make automotive parts, it still operates at the higher automotive quality and production standards.

22.    Additionally, these requirements serve to protect Hetronic's reputation and goodwill.  Hetronic proudly emphasizes through its marketing efforts the safety and reliability of its radio remote controls.  For example, on its website, Hetronic states that its "commitment to proven field results aligned with sound business practices continues to ensure Hetronic products as world class."    http://www.hetronic.com/products. Through its various safety and quality control procedures, Hetronic rigorously polices the quality of the products it manufactures.

**The Fuchs Companies Agreed to Not Misuse Hetronic's Confidential Information**

23.    Under the Distribution Agreements, the Fuchs Companies agreed to purchase Hetronic components and assemble the components into finished products for sale in the defined territories.  Thus, because of their position as Hetronic's assemblers

and distributors, the Fuchs Companies gained access to Hetronic's confidential and proprietary information.

24.     Specifically, under the Distribution Agreements, the Fuchs Companies had the authority to "communicate directly with the HETRONIC headquarters (Hetronic-International) in Oklahoma City," and Hetronic agreed that the Fuchs Companies would " receive directly [the] latest technical and commercial information, and [have] access to the HETRONIC R&D Department."  (Ex. 1 §3.2; Ex. 2 §3.2.)

25.     The Distribution Agreements further provided that "Hetronic-International will provide technical-, marketing-, and commercial-assistance on a regular basis."  (*Id.*)

26.     Additionally, as Hetronic distributors and assemblers, the Fuchs Companies had access to an internal Hetronic intranet referred to as H-PRO.  H-PRO was designed to be a repository of all products Hetronic's various distributors and assemblers made and sold.

27.     Under Section 6.6 of the Distribution Agreements, the Fuchs Companies were required "to generate and update the Product information on the internal webpage on the HETRONIC website [H-Pro], for all Products the Partner assembles or modifies." (Ex. 1 §6.6; Ex. 2 §6.6.)   Product information includes the following:  (1) system numbers; (2) blue prints of assembled products; and (3) bill of materials, which show the parts used to assemble the radio remote controls.

28.     The information contained in H-Pro is confidential and proprietary to Hetronic especially because most of the products sold to end users are not off the shelf

products.  Instead, many of the radio remote controls have to be customized to fit the particular needs of ultimate end-users.

29.    Thus, it was important for Hetronic and its partners to have a central repository of this information.  In this way, Hetronic could track what had been done, if a customer in another territory had a similar issue, or the same customer had a service question, or if Hetronic generally wanted to review the quality of its assemblers' and distributors' work.

30.    Throughout the relevant time period, the Fuchs Companies not only had access on H-PRO to information concerning the products that they assembled and distributed, but they had access to products sold or made by Hetronic or any of its other distributors or assemblers.

31.    In the Distribution Agreements, the Fuchs Companies acknowledged that they had access to Hetronic's confidential information, stating that:  "in the course of [their] duties," they would gain "access to" and "possession of Confidential Information" of Hetronic.  (Ex. 1 7.7; Ex. 3 § 7.7.)

32.    The Fuchs Companies further agreed "to keep all Confidential Information strictly confidential and not to use Confidential Information for any purpose or disclose Confidential Information to any person or entity."  (*Id.*)

33.    "Confidential Information" is defined in the Distribution Agreements as "any confidential or proprietary information" of Hetronic, "including, but not limited to, any technical and scientific information, any information relating to software architecture, design or code, any research and development information, any plans or

projections, any customer lists, advertiser lists, supplier lists, customer sales analyses, price lists and any other non-public information concerning" Hetronic's business.   (Ex. 1 §7.7; Ex. 2 §7.7.)

**The Fuchs Companies Agreed to Act in Hetronic's Best Interest**

34.    Because of their distributor and assembler status, their access to Hetronic's confidential and proprietary information, and their ability to use the Hetronic name, the Fuchs Companies "agree[d] and [bound]" themselves "to act in [Hetronic's] best interests with the due care and attention, as can be expected in [their] legal status as business[men], observing the rules of fair competition and acting in compliance with all applicable laws."  (Ex. 1 §3.3; Ex. 2 §3.3.)

35.    The Fuchs Companies also agreed under the Distribution Agreements "not to sell or service any products which are in competition to any of" Hetronic's products. (Ex. 1 §3.4; Ex. 2 §3.4.)

**Despite Their Agreements to the Contrary, The Fuchs Companies Schemed to Harm Hetronic**

36.    Unbeknownst to Hetronic until recently, the Fuchs Companies have engaged in a secret scheme to compete with Hetronic while still serving as Hetronic's distributors and assemblers.

37.    Hetronic learned about this scheme when a whistleblower who works for the Fuchs Companies contacted Hetronic.

38.    The whistleblower contacted Hetronic because the Fuchs Companies wanted him to sign a confidentiality agreement that prohibited him from sharing any

information about Hetronic products outside of the Fuchs Companies, including prohibiting him from discussing anything with Hetronic itself about products sold under the Hetronic name.

39.     That whistleblower told Hetronic that the Fuchs Companies have been making counterfeit Hetronic parts for the past three or four years.  Moreover, according to the whistleblower, Fuchs has expressly stated that he intends to compete directly with Hetronic.

40.     To further conceal their wrongful conduct, the Fuchs Companies put the Hetronic name on their counterfeit parts and used a part number that mirrors Hetronic's actual part number though they apparently added a prefix, "KH."

41.     As part of their efforts to counterfeit Hetronic parts, the Fuchs Companies have reverse engineered genuine Hetronic components.  In particular, over the past three or four years, the Fuchs Companies have frequently instructed their employees to duplicate Hetronic components.  For that purpose, Fuchs Companies employees retrieved circuit diagrams supplied by Hetronic or its authorized suppliers and then reversed engineered those components.

42.     Furthermore, Fuchs Companies employees used software provided by Hetronic to aid them in this process.

43.     Moreover, upon information and belief, as part of their reverse engineering efforts, these Fuchs Companies employees also used H-Pro to view and access Hetronic's confidential and proprietary information.

44.     Once the various components were reverse engineered, the Fuchs Companies then contracted with third parties to manufacture and supply these counterfeit components.  In some instances, former Fuchs Companies employees worked for the third party suppliers and thus were familiar with and relied upon their exposure to Hetronic's confidential and proprietary information to assist the Fuchs Companies in their misconduct.

45.     In many instances, the Fuchs Companies then replaced genuine Hetronic components with these counterfeit components.  The Fuchs Companies concealed the purchase and transfer of these counterfeit components by having Hydronic purchase the parts from third party suppliers, and then transfer the parts to H-Germany.

46.     The Fuchs Companies subsequently passed off these counterfeit parts and products to customers as though they were genuine Hetronic parts.

47.     The Fuchs Companies' violated Sections 1 and 6.2 of the Distribution Agreements by using these counterfeit, unapproved parts.

48.     Because Hetronic was not aware that the Fuchs Companies were sourcing parts from unidentified, unapproved manufacturers, neither these manufacturers nor their reverse engineered parts were subject to Hetronic's quality controls.  Upon information and belief, there were some technical failures with some of these counterfeit parts.

49.     The Fuchs Companies have amassed a significant number of counterfeit parts to prepare for their eventual open competition with Hetronic.  As a result, the Fuchs Companies' purchase of genuine parts from Hetronic has dropped significantly.  Indeed, for some key parts that the Fuchs Companies have counterfeited, the Fuchs Companies

no longer purchase even a single one from Hetronic.  In raw number terms, sales of genuine parts from Hetronic to the Fuchs Companies for fiscal year 2013 fell by approximately $2.3 million in comparison to fiscal year 2012 which is constitutes approximately a 50% decrease in sales.

50.     The Fuchs Companies' conduct has harmed Hetronic in a number of ways. In particular, the Fuchs Companies have:  (a) stolen, misused, and improperly disclosed Hetronic's confidential and proprietary information; (b) competed directly with Hetronic and denied Hetronic sales by instead selling the counterfeit parts; and (c) exposed Hetronic to the risk that the counterfeit parts are not compliant with its quality and reliability standards and that could irreparably injure Hetronic's reputation and goodwill.

51.     On June 6, 2014, after having become aware of the Fuchs Companies' material breaches of the Distribution Agreements, Hetronic terminated the Distribution Agreements because of the material breaches.   At the same time, Hetronic also terminated the License Agreements referenced above in Paragraph 18.

52.     Notwithstanding Hetronic's termination of the agreements, the Fuchs Companies improperly have continued to hold themselves out as authorized Hetronic distributors and assemblers.  For example, the Fuchs Companies' websites continue to operate using the Hetronic name and mark, advertising the sale and service of Hetronic-branded parts.  (*See* Exs. 3 and 4, screen shots taken on 6/20/14 of the H-Germany and Hydronic websites, respectively.)

## COUNT 1
### (Breach of Contract against H-Germany)

53.    Hetronic incorporates by reference Paragraphs 1 through 52 as if fully set forth herein.

54.    Hetronic and H-Germany were parties to the H-Germany Distribution Agreement.

55.    The H-Germany Distribution Agreement is a valid and enforceable contract.

56.    Hetronic fully performed under the H-Germany Distribution Agreement.

57.    Pursuant to Section 1.1 of the H-Germany Distribution Agreement, Hetronic granted H-Germany the right to assemble and distribute Hetronic radio remote controls on the condition that it use "components solely provided or approved by HETRONIC." (Ex. 1 §1.)

58.    Pursuant to Section 6.2 of the H-Germany Distribution Agreement, H-Germany agreed to use only genuine Hetronic parts or Hetronic approved parts.  (Ex. 1 §6.2.)

59.    Pursuant to Section 7.7 of the H-Germany Distribution Agreement, H-Germany acknowledged that confidential information it learned about Hetronic's business, including "any technical and scientific information" belonged to Hetronic.  (Ex. 1 §7.7.)

60.    Under Section 7.7, H-Germany further agreed that it would not disclose or use such information for any purpose.  (*Id.*)

61.     Pursuant to Section 3.3 of the H-Germany Distribution Agreement, H-Germany agreed and bound itself to act in Hetronic's best interests with the due care and attention as can be expected in its legal status, "observing the rules of a fair competition and acting in compliance with all applicable laws." (Ex. 1 §3.3.)

62.     Pursuant to Section 3.4 of the H-Germany Distribution Agreement, H-Germany agreed to not compete with Hetronic while serving as Hetronic's distributor and assembler. (Ex. 1 §3.4)

63.     H-Germany materially breached all of the above provisions of the H-Germany Distribution Agreement.

64.     First, H-Germany breached Sections 1 and 6.2 of the H-Germany Distribution Agreement by not using genuine Hetronic parts or Hetronic approved parts, but instead H-Germany used counterfeit, unapproved parts.

65.     Second, H-Germany breached Section 7.7 of the H-Germany Distribution Agreement by using Hetronic's confidential and proprietary information for its personal gain.

66.     Information about Hetronic's science, technology and components belongs to Hetronic. H-Germany only had access to that information by virtue of its agreements with Hetronic.

67.     Third, H-Germany breached Section 3.3 of the H-Germany Distribution Agreement by not acting in Hetronic's best interests when, among other things, it reverse engineered and subsequently sold counterfeit parts claiming that they were genuine Hetronic parts, using Hetronic's name and trademark.

68. <u>Fourth</u>, H-Germany breached Section 3.4 of the H-Germany Distribution Agreement by competing directly with Hetronic while still under contract to serve as its distributor and assembler.

69. As a result of H-Germany's breaches of the H-Germany Distribution Agreement, Hetronic has been injured. Among other things, Hetronic sales in the territory serviced by H-Germany have fallen dramatically, and Hetronic's goodwill and reputation have been put at risk.

70. Additionally, Hetronic will be irreparably harmed if H-Germany is permitted to benefit from its improper conduct.

WHEREFORE, Hetronic respectfully requests that this Court: (1) enter judgment against defendant H-Germany for all damages resulting from its breach of the H-Germany Distribution Agreement, in an amount to be determined by a jury; (2) require H-Germany to identify all customers to whom it has sold or passed off counterfeit parts; (3) require H-Germany to return (for reasonable compensation) to Hetronic all authentic Hetronic parts currently in its possession; (4) require H-Germany to return all Hetronic materials, including but not limited to, documents, software, drawings and equipment; (5) require H-Germany to return all confidential Hetronic information and anything downloaded from H-Pro by employees of H-Germany; (6) require H-Germany to turn-over all information that it was required but failed to upload to H-Pro; (7) require H-Germany to identify all manufacturers it and/or Hydronic have used to source non-Hetronic parts; (8) enter an order authorizing the seizure and destruction of the counterfeit parts; (9) permanently enjoin H-Germany from publicly disclosing or

-16-

otherwise using Hetronic's confidential and proprietary information; and (10) grant any other relief as may be appropriate and just, in law or equity.

## COUNT 2
### (Breach of Contract against Hydronic)

71.      Hetronic incorporates by reference Paragraphs 1 through 52 as if fully set forth herein.

72.      Hetronic and Hydronic were parties to the Hydronic Distribution Agreement.

73.      The Hydronic Distribution Agreement is a valid and enforceable contract.

74.      Hetronic fully performed under the Hydronic Distribution Agreement.

75.      Pursuant to Section 1.1 of the Hydronic Distribution Agreement, Hetronic granted Hydronic the right to assemble and distribute Hetronic radio remote controls on the condition that it use "components solely provided or approved by HETRONIC."  (Ex. 2 §1.)

76.      Pursuant to Section 6.2 of the Hydronic Distribution Agreement, Hydronic agreed to use only genuine Hetronic parts or Hetronic approved parts.  (Ex. 2 §6.2.)

77.      Pursuant to Section 7.7 of the Hydronic Distribution Agreement, Hydronic acknowledged that confidential information it learned about Hetronic's business, including "any technical and scientific information" belonged to Hetronic.  (Ex. 2 §7.7.)

78.      Under Section 7.7, Hydronic further agreed that it would not disclose or use such information for any purpose.  (*Id.*)

79.     Pursuant to Section 3.3 of the Hydronic Distribution Agreement, Hydronic agreed and bound itself to act in Hetronic's best interests with the due care and attention as can be expected in its legal status, "observing the rules of a fair competition and acting in compliance with all applicable laws." (Ex. 2 §3.3.)

80.     Pursuant to Section 3.4 of the Hydronic Distribution Agreement, Hydronic agreed to not compete with Hetronic while serving as Hetronic's distributor and assembler. (Ex. 2 §3.4.)

81.     Hydronic materially breached all of the above provisions of the Hydronic Distribution Agreement.

82.     First, Hydronic breached Sections 1 and 6.2 of the Hydronic Distribution Agreement by not using genuine Hetronic parts or Hetronic approved parts, but instead Hydronic used counterfeit, unapproved parts.

83.     Second, Hydronic breached Section 7.7 of the Hydronic Distribution Agreement by using Hetronic's confidential and proprietary information for its personal gain.

84.     Information about Hetronic's science, technology and components belongs to Hetronic.  Hydronic only had access to that information by virtue of its agreements with Hetronic.

85.     Third, Hydronic breached Section 3.3 of the Hydronic Distribution Agreement by not acting in Hetronic's best interests when, among other things, it assisted H-Germany in its scheme to reverse engineer and subsequently sell counterfeit parts claiming that they were genuine Hetronic parts, using Hetronic's name and trademark.

86.     Fourth, Hydronic breached Section 3.4 of the Hydronic Distribution Agreement by competing directly with Hetronic while still under contract to serve as its distributor.

87.     As a result of Hydronic's breaches of the Hydronic Distribution Agreement, Hetronic has been injured.  Among other things, Hetronic sales in the territory serviced by Hydronic have fallen dramatically, and Hetronic's goodwill and reputation have been put at risk.

88.     Additionally, Hetronic will be irreparably harmed if Hydronic is permitted to benefit from its improper conduct.

WHEREFORE, Hetronic respectfully requests that this Court:  (1) enter judgment against defendant Hydronic for all damages resulting from its breach of the Hydronic Distribution Agreement, in an amount to be determined by a jury; (2) require Hydronic to identify all customers to whom it has sold or passed off counterfeit parts; (3) require Hydronic to return (for reason compensation) to Hetronic all authentic Hetronic parts currently in its possession; (4) require Hydronic to return all Hetronic materials, including but not limited to, documents, software, drawings and equipment; (5) require Hydronic to return all confidential Hetronic information and anything downloaded from H-Pro by employees of Hydronic; (6) require Hydronic to turn-over all information that it was required but failed to upload to H-Pro; (7) require Hydronic to identify all manufacturers it and/or H-Germany have used to source non-Hetronic parts; (8) enter an order authorizing the seizure and destruction of the counterfeit parts; (9) permanently enjoin Hydronic from publicly disclosing or otherwise using Hetronic's confidential and

proprietary information; and (10) grant any other relief as may be appropriate and just, in law or equity.

Dated:  June 20, 2014

Respectfully submitted,

/s/ John N. Hermes
John N. Hermes, OBA # 4133
Sam R. Fulkerson, OBA # 14370
Philip R. Bruce, OBA # 30504
Andrew J. Morris, OBA # 31658
MCAFEE & TAFT A
PROFESSIONAL CORPORATION
10th Floor, Two Leadership Square
211 North Robinson
Oklahoma City, OK 73102-7103
(405) 235-9621 (phone)
(405) 235-0439 (fax)
john.hermes@mcafeetaft.com
sam.fulkerson@mcafeetaft.com
philip.bruce@mcafeetaft.com
andrew.morris@mcafeetaft.com

and

Debbie L. Berman (pro hac pending)
Michael H. Margolis (pro hac pending)
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL  60654-3456
(312) 923-2764 (phone)
312-840-7764 (fax)
DBerman@jenner.com
MMargolis@jenner.com

*Counsel for Hetronic International, Inc.*