IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| HETRONIC INTERNATIONAL, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CIV-14-650-F |
| | ) | |
| HETRONIC GERMANY GmbH, | ) | |
| HYDRONIC-STEUERSYSTEME GmbH, | ) | |
| ABI HOLDING GmbH, | ) | |
| ABITRON GERMANY GmbH, | ) | |
| ABITRON AUSTRIA GmbH, and | ) | |
| ALBERT FUCHS, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM Re: PERMANENT INJUNCTION

Concurrently with the filing of this memorandum, the court has filed an order granting permanent injunctive relief in favor of the plaintiff and against the defendants. The facts that compel a grant of injunctive relief are stated in the injunctive order and will not be repeated in this memorandum except as may be relevant to the issues addressed in this memorandum.

The court's grant of injunctive relief is based on well-established standards for granting (or withholding) that species of equitable relief. The usual prerequisites to injunctive relief (such as irreparable harm, the absence of an adequate remedy at law, balance of hardship, and the public interest) have been established so clearly as to obviate the need for elaboration of those matters beyond the findings set forth on page 4 of the injunctive order. Suffice it to say that entry of a permanent injunction is well-warranted, substantially for the reasons set forth in plaintiff's opening brief. Whether the defendants will comply with the injunctive order is a matter to be determined, but there is no room for doubt that, absent injunctive relief, defendants would persist undaunted in their violations of the intellectual property and other

rights of the plaintiff. That much was made clear at the jury trial and at the injunction hearing on April 7, 2020. But one issue–the geographic scope of injunctive relief–is very much in issue and deserves special attention. Plaintiff is a U.S. company; the defendants are European entities (or, in the case of defendant Albert Fuchs, a European individual). Defendants argue strenuously that any injunctive relief granted in this case by a U.S. court must stop at the water's edge. For the reasons set forth in this memorandum, the court disagrees.

Geographic Scope of Injunctive Relief

Plaintiff seeks a permanent injunction enjoining defendants' infringing activities worldwide. Defendants object to the entry of any permanent injunction, but argue that if any permanent injunction is granted, it should be limited to direct sales of radio remote controls and spare parts into the United States. Defendants assert that the Lanham Act does not reach foreign sales by foreign defendants.

Defendants previously raised the issue of extraterritorial application of the Lanham Act to their foreign sales at the summary judgment stage. Relying on the three-factor test established in Vanity Fair Mills, Inc. v. T. Eaton Co., 234 F.2d 633, 642 (2d Cir. 1956), defendants argued, as a matter of subject matter jurisdiction, that the Lanham Act could not be applied to their foreign sales. Plaintiff countered that extraterritorial application of the Lanham Act was justified under the Vanity Fair test, but also advocated the use of a similar three-factor test followed by the Ninth Circuit in Star-Kist Foods, Inc. v. P.J. Rhodes & Co., 769 F.2d 1393, 1395 (9th Cir. 1985),[1] which plaintiff believed the Tenth Circuit would adopt and which three factors, it contended, supported extraterritorial application. Out of an abundance of caution, the court applied both three-factor tests, and after doing so, "rule[d] that the

---

[1] This three-factor test incorporated the test developed by the Ninth Circuit to determine the extraterritorial reach of antitrust laws in Timberlane Lumber Co. v. Bank of America, N.T. and S.A., 549 F.2d 597, 613 (9th Cir. 1976).

Lanham Act reaches extraterritorially to defendants' foreign sales." Doc. no. 311, p. 21.

In their summary judgment papers and again in their permanent injunction response, defendants maintain that extraterritorial application of the Lanham Act is an issue of subject matter jurisdiction. Because the court did not hold an evidentiary hearing to resolve disputed jurisdictional facts, defendant now argue that the court has no evidentiary basis for a grant of permanent injunctive relief with extraterritorial reach.

As the court determined in its summary judgment ruling, the extraterritorial reach of the Lanham Act is not an issue relating to the court's subject matter jurisdiction. It goes to the merits of plaintiff's trademark claims. *See*, Morrison v. National Australia Bank Ltd., 561 U.S. 247, 253-254 (2010) (extraterritorial reach of §10(b) of the Securities Exchange Act of 1934 is a "merits question" not a "question of subject-matter jurisdiction"); *see also* Trader Joe's Company v. Hallatt, 835 F.3d 960, 968 (9th Cir. 2016) ("We hold that the extraterritorial reach of the Lanham Act is a merits question that does not implicate federal courts' subject-matter jurisdiction.") (citing Morrison, 561 U.S. at 253-254); and A.O. Smith Corporation v. USA Smith Industry Dev. Inc., 2017 WL 2224539, *2 (D. Colo. May 22, 2017) (agreeing with the conclusion in Trader Joe's that "the extraterritorial reach of the Lanham Act goes to the merits of a trademark claim"). Although not cited in the court's summary judgment order, the Tenth Circuit has likewise concluded that the extraterritorial reach of the Lanham Act is not a matter of jurisdiction. Derma Pen, LLC v. 4EverYoung Limited, 736 Fed Appx. 741, 748 n. 4 (10th Cir. 2018) (unpublished decision cited as persuasive under 10th Cir. R. 32.1(A)). Defendants have not cited any authority which would suggest that the court should reconsider its ruling. In any event, even if the extraterritorial application issue were jurisdictional, it was not raised by defendants by the filing of

a dismissal motion under Rule 12(b)(1), but rather, by the filing of a partial summary judgment motion under Rule 56.  Holt v. United States, 46 F.3d 1000, 1003 (10th Cir. 1995) ("A court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1).")  Because the matter was before the court under the standards of Rule 56 rather than Rule 12(b)(1), an evidentiary hearing was neither required nor appropriate.  Moreover, defendants have cited no authority for the proposition that, as a procedural matter, the issue of extraterritorial application should have been treated as a matter to be contested once again at trial.

The court recognizes that, for reasons of relevance, it did not permit defendants to challenge the testimony of Josef Scheuerer, relating to confusion in the marketplace, for the purpose of showing that the confusion was in Europe and not the United States.  But even if it had received the evidence included in defendants' offer of proof, via the affidavit of Reimer Bulling, there would still be a sound evidentiary basis in the trial record supporting the entry of a permanent injunction.  The jury's verdict of willful infringement likewise supports that determination.  Nonetheless, as will be seen, plaintiff is not foreclosed from relying upon confusion in Europe to show a substantial effect on United States commerce.

The Vanity Fair test, upon which defendants rely in support of their challenge to extraterritorial application, asks whether (1) the defendant's conduct had a substantial effect on United States commerce; (2) the defendant is a United States citizen; and (3) there exists a conflict with trademark rights established under foreign law.  Vanity Fair Mills, Inc., 234 F.2d at 642.  Here, there is no question that defendants are not citizens of the United States and defendants, in challenging the extraterritorial reach of a permanent injunction, do not argue that there is a conflict

with the trademark rights established under foreign law.² The question, as acknowledged in their response, is whether defendants' activities have had a substantial effect on United States commerce.

In its summary judgment ruling, the court relied, in part, upon diversion of sales from plaintiff by the defendants to conclude that defendants' conduct had a substantial effect on United States commerce. Defendants argue that the diversion-of-sales theory does not apply to foreign sales by foreign defendants. They point out that the Vanity Fair court applied the Lanham Act only to the foreign defendant's sales in the United States and not in Canada. However, the Vanity Fair court found that the substantial effect on United States commerce factor was "present" under the facts of the case. Vanity Fair Mills, Inc., 234 F.2d at 642. Those facts revealed that the defendant diverted sales from plaintiff in Canada. Id. at 638. The appellate court, however, concluded that the absence of the other two factors was fatal to extraterritorial application to the sales in Canada. Id. at 643. Vanity Fair does not support defendants' argument regarding the diversion-of-sales theory.³

Defendants also rely heavily upon the Fourth Circuit's decision in Tire Engineering and Distribution, LLC v. Shandong Linglong Rubber Company, 682 F.3d 292 (4th Cir. 2012). In that case, the appellate court stated that "courts invoking the diversion-of-sales theory have required the defendants to be U.S. corporations

---

² Nonetheless, as mentioned at the permanent injunction hearing, the court has not seen anything that would suggest in any cogent way that a permanent injunction would conflict with the applicable law of the European Union.

³ Defendants also cite the Second Circuit's decision in Atlantic Richfield Co. v. Arco Globus Intern. Co., Inc., 150 F.3d 189 (2d Cir. 1998), to support their argument. However, in that case, the appellate court did not address the issue of diverted sales. The defendant's "principal activity [was] identifying products to be traded by its *de facto* parent, Arco Globus Company Ltd., a Channel Islands corporation engaged in the financing, processing, and sale of crude oil, the trading of oil and gas derivatives, and the provision of refinery engineering services." Id. at 191. Defendants do not address another Second Circuit case, Totalplan Corp. of America v. Colborne, 14 F.3d 824, 830-831 (2d Cir. 1994), where the appellate court analyzed diversion of foreign sales but found that the evidence failed to show lost sales.

that conducted operations—including at least some of the infringing activity—within the United States." *Id*. at 311.  This court, in its summary judgment order, acknowledged the Fourth Circuit's decision, but was not persuaded to follow it.  The Fourth Circuit relied upon <u>Ocean Garden, Inc. v. Marktrade Co., Inc.</u>, 953 F.2d 500, 504 (9th Cir. 1991) and <u>American Rice, Inc. v. Arkansas Rice Growers Co-op Ass'n</u>, 701 F.2d 408, 414-415 (5th Cir. 1983), for the quoted statement.  However, neither of those cases "required" defendants to be U.S. corporations as a prerequisite to the use of the diversion-of-sales theory.

Additionally, defendants rely upon <u>McBee v. Delica Co., Ltd.</u>, 417 F.3d 107 (1st Cir. 2005), which recognized that "[c]ourts have considered sales diverted from American companies in foreign countries in their analyses." *Id*. at 126.  However, defendants argue that the First Circuit dismissed the plaintiff's damages claim because the defendant's sales in Japan did not cause any confusion in the United States.  Defendants maintain that there must be confusion in the United States, rather than overseas, for the diversion-of-sales theory to apply to them.  Viewing the matter in light of the purpose of the Lanham Act, that argument is bereft of intrinsic logic.  But it should be noted, aside from that, that the First Circuit did not foreclose a claim based on confusion to foreign consumers.  According to the appellate court:

> Evidence of economic harm to [plaintiff] in Japan due to confusion of Japanese consumers is less tightly tied to the interests that the Lanham Act intends to protect, since there is no United States interest in protecting *Japanese consumers*.  American courts do, however, arguably have an interest in protecting American commerce by protecting [plaintiff] from lost income due to the tarnishing of his trademark in Japan.

*Id*. at 126 (emphasis in original).

The appellate court found that plaintiff presented no evidence of such harm.  In the case at bar, the trial record contains ample evidence of such harm.  The court

concludes that the McBee case does not preclude the application of the diversion-of-sales theory.

Defendants further rely upon a case from the Northern District of Illinois, Alcar Group Inc. v. Corporate Performance Systems, Ltd., 109 F.Supp.2d 948 (N.D. Ill. 2000). Alcar did not involve the diversion-of-sales theory. Moreover, in the case at bar, plaintiff's evidence at trial showed more than that the trademark violations "hurt the plaintiff's ability to conduct its business and license its products worldwide." Id. at 949.

The court remains satisfied that evidence relied upon by plaintiff as to the diversion of sales in foreign countries is adequate, and then some, to demonstrate a substantial effect on United States commerce. The court also disagrees with defendants' position that there is no evidence of lost sales. The evidence presented supports plaintiff's contention that the sales made by defendants in Europe could have been made by plaintiff but for defendants' infringing activity.

Defendants maintain that they were prepared to show at trial, through Mr. Bulling, that confusion in the United States was not possible. They maintain that there was evidence at trial of only two direct sales by Abitron Germany to the United States. The problem with that is that the evidence also showed that defendants sold to foreign customers substantial quantities of infringing products which they knew were destined for the United States. See, McBee, 417 F.3d at 125 ("Quite commonly, plaintiffs in these sorts of cases can meet their burden by presenting evidence that while the initial sales of infringing goods may occur in foreign countries, the goods subsequently tend to enter the United States in some way and in substantial quantities.")[4] The evidence also showed that defendants exhibited infringing products at international trade shows attended by United States customers.

---

[4] During the permanent injunction hearing, counsel for defendants represented that defendants did not intend to continue selling directly to the United States but made no such representation as to indirect sales.

Moreover, the trial record included other evidence of confusion in the U.S. marketplace. The court concludes that the trial record contains reliable evidence of confusion in the United States.

While addressing the Vanity Fair test in its papers, plaintiff also advocates the use of the Ninth's Circuit Timberlane three-factor test, which the appellate court followed in Star-Kist Foods. In Timberlane, the appellate court stated:

> Third, there is the additional question whether the interests of, and links to, the United States including the magnitude of the effect on American foreign commerce are sufficiently strong, vis-à-vis those of other nations, to justify an assertion of extraterritorial authority.

549 F.2d at 613.

In American Rice, Inc., the Fifth Circuit addressing Vanity Fair, stated:

> In *Vanity Fair*, the Second Circuit . . . stated that the degree of effect on United States commerce must be 'substantial' before the contacts and interests of the United States are sufficient to support the exercise of extraterritorial jurisdiction.

701 F.2d at 414 n. 8.

These two cases look at the "interests of, and links to" and the "contacts and interests" of the United States in determining extraterritorial application. In the case at bar, defendants clearly have contacts with and links to the United States, which in the court's view, make a stronger case for extraterritorial application of a permanent injunction.

In fact, it is at this point that any remaining qualms about extraterritorial application really melt away. Specifically, Hetronic Germany and Hydronic-Steuersysteme GmbH had a very intricate and carefully crafted contractual relationship with plaintiff. That relationship provided the vehicle that facilitated the infringement. After the contractual relationship was terminated due to defendants' infringing activities, the companies continued to hold themselves out as connected with plaintiff. Torsten Rempe, plaintiff's former President and a

United States citizen, was hired as a consultant to assist with defendants' activities. The Abitron companies were formed and took over Hetronic Germany and Hydronic-Steuersysteme's operations, taking all employees but one. They applied for and registered the "Abitron" trademark in the United States and hired a United States distributor to sell products in competition with plaintiff. They sent employees to train salespersons and to perform repairs in the United States. The companies knew their products were exhibited at United States trade shows. They also exhibited at international trade shows with United States customers. The companies sold infringing products directly and indirectly in the United States.

Although defendants are foreign citizens, their links to and contacts with the United States are plainly sufficient to provide substantial additional support for entry of an injunction having extraterritorial application.

In <u>Steele v. Bulova Watch Co.</u>, 344 U.S. 280 (1952), the Supreme Court stated:

> Nor do we doubt the District Court's jurisdiction to award appropriate relief if warranted by the facts after trial . . . Where, as here, there can be no interference with the sovereignty of another nation, the District Court in exercising its equity powers may command persons properly before it to cease or perform acts outside its territorial jurisdiction.

*Id*. at 289.

After careful consideration, the court concludes that the evidence in the trial record supports the entry of a permanent injunction that applies to defendants' foreign sales. Therefore, the scope of the permanent injunction shall be worldwide as requested by plaintiff.

Dated this 22nd day of April, 2020.

_____
STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

14-0650p094.docx